RUBEN CONDENSER CO. et al. v. COPELAND REFRIGERATION CORPORATION.*

No. 7288.

District Court, E. D. New York.

Aug. 22, 1935.

Watson, Bristol, Johnson & Leavenworth, of New York City (Lawrence Bristol and Charles P. Bauer, both of New York City, and Leon Robbin, of Washington, D. C., of counsel), for plaintiffs.

Merrell E. Clark, of New York City, and R. .E. Fidler, of Chicago, Ill. (Harold F. Watson, of New York City, of counsel), for defendant.

CAMPBELL, District Judge.

This is an action based on the alleged infringement of patent No. 1,710,073, issued to Samuel Ruben, for electrical condenser, granted April 23, 1929, on an application filed March 21, 1927; and patent No. 1,714,191, issued to Samuel Ruben, for electrical condenser, granted May 21, 1929, on an application filed December 22, 1926, by the defendant Copeland Refrigeration Corporation, in the sale of certain dry electrolytic condensers in conjunction with electric motors supplied by Delco Products Corporation, some of which electrolytic condensers were manufactured by Delco Products Corporation, and some by Aerovox Corporation, of Brooklyn, N. Y.

No further consideration as to those manufactured by Aerovox Corporation is necessary, as it was licensed under the patents Nos. 1,710,073 and 1,714,191 in suit, and the charge of infringement as to those condensers was limited to the Ruben patent, No. 1,891,207, and by stipulation the decree in this case as to Aerovox condensers is to conform to the decree in the case of Ruben Condenser Co. and Mallory v. Aerovox Corporation, 77 F.(2d) 266, in which case the Circuit Court of Appeals

of this Circuit has held the Ruben patent, No. 1,891,207, invalid.

The plaintiff Ruben Condenser Company is the owner of the patents in suit, and the plaintiff P. R. Mallory & Co., Inc., is the holder of an exclusive license under the patents in suit, with the right to grant sublicenses.

Condensers manufactured and sold by the Mallory Company are marked with the numbers of the Ruben patents, 1,710,073, 1,714,191, and 1,891,207; those manufactured and sold by the Aerovox Company under license are marked with the Ruben numbers 1,710,073 and 1,714,191, and those manufactured and sold by the Sprague Specialties Company and Magnavox Company, under license, are marked with the numbers of Ruben patents, 1,710,073 and 1,714,191.

The defense of this suit is being conducted by Delco Products Corporation.

This suit is based on claims 2, 5, 6, 7, and 8 of the Ruben patent, No. 1,710,073, and claims 4, 5, 6, and 7 of Ruben patent, No. 1,714,191.

The defendant has interposed an answer alleging the defenses of invalidity, double patenting, and noninfringement.

The patentee in his specification of patent No. 1,710,073 says:

"This invention relates to electric condensers and has for an object the provision of a suitable spacer, for use particularly in separating the electrode plates of a condenser containing a fluid or semifluid dielectric or electrolyte medium, which will not react electrically with the electrode surfaces.

"Another object is the provision of an electrical condenser having both a relatively high capacitance when used in alternating current circuits and a high direct current storage capacity which possesses long life with good operating characteristics over a wide range of atmospheric conditions.

"Another object is the provision of an electrolyte composition for an electrolytic condenser which will possess long life and will automatically and quickly revive itself after any temporary removal of its water of solution."

He further says: "Briefly these objects are accomplished by employing electrode plates at least one of which (preferably the anode) is a film-forming composition, separating said plates uniformly by a retiform or textural spacer which has been treated so that its individual fibres are coated with a non-conductive film, coating the spacer with an electrolyte in the form of a paste containing a film-forming electrolyte suspended or mixed with a stable hygroscopic material of preferably high viscosity, as glycerine, and applying a uniform pressure to the condenser plates or elements to insure continuous contact between the electrolyte and the electrodes or electrode coatings."

The patentee in the specification of the patent No. 1,714,191 says:

"This invention relates to electrostatic condensers, and it relates more particularly to electrical condensers of the electrolytic type.

"According to the terms of my invention the device consists of film-forming electrodes separated by an electrolyte composed of an hygroscopic material with a small percentage of a stablizing solution and a neutral or slightly alkaline salt in suspension with said stabilizing solution and said hygroscopic material and held in a fixed paste-like density and concentration by an insulating gauzelike textile, and suitable pressure applied to maintain close surface contact between the electrolyte and the electrodes."

He further said: "For the electrode material I prefer thin aluminum sheets having an oxide film formed upon the surfaces before assembly, and as the electrolyte, glycerin having a relatively small amount of water and having mixed therewith suspended powdered sodium bicarbonate, a small percentage of boric acid being present to stabilize the paste which has a sodium borate content due to reaction of the boric acid with the sodium bicarbonate and to increase the conductivity of the mixture."

According to the stipulation (Exhibit 9) the Delco condensers are manufactured as follows:

"1. Two strips of aluminum foil are provided with a suitable dielectric film by means of a suitable film-forming process.

"2. Two strips of the filmed aluminum foil and two strips of 80x80 mesh cloth (80 threads per inch, in each direction) are arranged as alternate layers, and the desired length of the composite strip thus formed is wound upon an arbor, suitably fastened, and removed from the arbor.

"3. The resulting unit, called a section, is then immersed for about 5½–7½ hours in an electrolyte comprising 65% glycerin (C. P.) and 35% ammonium borate (Pacific Coast Borax Co.), which electrolyte is constantly agitated and maintained continuously at a temperature of approximately 235° F. The electrolyte has a specific viscosity between 8 and 9, as measured by a Saybolt Viscosimeter at 200° F. and compared with the viscosity of water at 60° F.

"4. After impregnation as described, the section is permitted to drain and cool, is reformed, tested and wrapped in varnished cloth, and is placed in a suitable leak-proof container, the lid of which is soldered in place. Prior to the soldering operation the two aluminum strips are connected to suitable terminals extending through the lid of the container."

The Delco condenser (Exhibit 21), similar to Plaintiffs' Exhibit 8, as sold by the defendant Copeland Refrigeration Corporation within the Eastern District of New York, was opened in court and comprised two aluminum foils, each provided with a dielectric film, interleaved with two gauze spacers, rolled up and impregnated with an electrolyte.

The electrolyte was of a viscous paste-like consistency.

The rolled condenser section was wrapped in black varnished cloth, then in corrugated waxed paper or cardboard, and inclosed in a tin can, the inside of which was coated with a black lacquer or enamel. From each aluminum foil projected a tab, which was connected with a threaded stud passing through the top of the can.

As to the rolled condenser section, insulating wrapping inclosing metal container, and connection of the foils with threaded studs passing through the top of the can, the Delco structure is a practical duplicate of that shown and described in the patents in suit.

The Delco condenser is quite similar in construction to the Aerovox condenser, the Delco electrolyte being more sticky and less fluid than the Aerovox electrolyte. Both the Delco and Aerovox condensers are obviously used to perform the same function in connection with motors manufactured by Delco Products Corporation.

The two Ruben patents, Nos. 1,710,073 and 1,714,191, in suit were discussed by the Circuit Court of Appeals for the Second Circuit, in the case of Aerovox Corporation v. Concourse Electric Co., 65 F. (2d) 386, 387, 389.

Uncontested decrees have been entered in the six following entitled suits, upholding the validity of the Ruben patents, Nos. 1,710,073 and 1,714,191, in suit:

Howell Electric Motors Company, consent decree.

Polymet Manufacturing Corporation, decree after inquest.

Century Radio Products Co., Inc., decree after inquest.

Polymet Manufacturing Corporation, decree pro confesso.

Alan Radio Corporation, consent decree.

Samuel Roth (federated purchaser), decree pro confesso.

The term "dry electrolytic condensers" is generally used in the trade to differentiate from the well-known wet electrolytic condensers of the prior art, and is so used here.

With the exception of Edelman's rock-hard A-condenser, however, the so-called dry electrolytic condensers contain an electrolyte of viscous paste-like consistency, but are dry enough to permit of their being packaged without the necessity for leak-proof containers which are required with wet electrolyte condensers.

The sales of the plaintiff P. R. Mallory & Co., Inc., and its licensees, of condensers marked under the patents in suit, from January 1, 1931, through the first quarter of 1935, were in excess of $8,000,-000, and the royalties paid for that period exceed $350,000, and in addition approximately $90,000 has been paid by licensees as part consideration for the execution of their license contracts. From the end of 1926 and through 1930, the Grigsby-Grunow-Hinds Company paid about $35,000 in royalties under its license.

Most of the licensees with the exception of the Aerovox Company are licensed not only under the patents in suit, but under fourteen other patents, including the Ruben patent No. 1,891,207, which patent was held to be invalid by the Circuit Court of Appeals of this Circuit, in Ruben Condenser Company and P. R. Mallory & Co., Inc. v. Aerovox Corporation, and the evidence does not show what portion of the royalties was paid under the two patents in suit.

Plaintiffs showed on the trial that certain condensers made and sold by the plaintiff Mallory Company are marked under the patents in suit, and have a wide range of adaptability, but the evidence offered on the trial does not show the character or make-up of the electrolytes embodied in any of these condensers.

The same may be said of the condensers made by the licensees of the Mallory Company, as no evidence was offered on the trial as to the character or make-up of the electrolytes used.

The sublicensees under the Ruben patents are required to contribute to the expenses of the litigation against infringers, in addition to the royalties they pay, and the installments in lieu of cash consideration at the time they receive their licenses. The plaintiff Mallory Company also required a provision for price control, which was proper. United States v. General Electric Co., 272 U.S. 476, 490, 47 S.Ct. 192, 71 L.Ed. 362.

The evidence shows that Delco Products Corporation purchased condensers, licensed under the patents in suit, for some time, and that it did not commence to make and sell the alleged infringing condensers until after it had applied for, and been refused by the plaintiff Mallory Company, a license to manufacture condensers under the patents in suit.

This together with the fact that the sublicensees first satisfied themselves that they could not manufacture commercial dry electrolyte condensers without infringing the Ruben patents,, and applied to the plaintiff Mallory Company for licenses, shows what they thought of the patents in suit.

The defendant offered in evidence as prior art the following:

British patent, No. 1069, A.D.1896, to Charles Pollak, for improvements in or connected with electrical condensers, accepted January 15, 1897. It purports to be the original disclosure of the film-forming property of aluminum and its utility as a condenser. The specification stresses the "preforming" of the plates in a vessel or jar containing an alkaline electrolyte solution in which two aluminum plates or electrodes are arranged (see structures for wet electrolytic-condensers, shown in Peek patent, No. 1,008,860, and Zimmerman patent, No. 1,074,231).

Pollak adds: "The alkaline solution may be replaced by any other suitable electrolyte (say, a gas, if desired, or any convenient solid or semi-solid body) which under the circumstances named will form a coating such as is above described upon the positive electrode." Page 2, lines 23–26; page 3, lines 51–54.

He did not suggest how to prepare "any other suitable electrolyte."

A dry electrolytic condenser had not then arrived, and a condenser having a gas electrolyte has not yet been shown to have been devised.

Neither the patents in suit nor Delco use the structure or electrolyte of Pollak.

Swiss patent, No. 81,050, to Prof. Dr. H. Greinacher, for electrolytic valve cell, published May 1, 1919. This patent relates to electrolytic valve cells.

The term "electrolytic valve" is used to describe an electrolytic rectifier.

While it is true that the electrolytic rectifiers, electrolytic condensers, both wet and dry, and electrolytic lightning arresters may be said to be of the same general type, in that they all make use of a film formed on an aluminum plate, the fact is that these devices use different properties of the film, and therefore require different physical embodiment and different electrolytes.

Electrolytic condensers as such are not mentioned anywhere in that patent.

That patent refers to the electrolyte liquid and always to a liquid, but it nowhere specifies what electrolyte liquid is intended. The needs and requirements of a rectifier do not suggest the needs and requirements or the endurance of the condenser.

The witness Booe's tests demonstrated the inapplicability of Greinacher's suggestions as to dry electrolytic condensers.

Patent No. 900,278, to Arthur S. Hickley, for electrolytic alternating-current rectifier, granted October 6, 1908, on an application filed November 12, 1907. This patent relates to an alternating current rectifier, with an exceptional form of cells. Porcelain cups 5 and 6 are interposed between the two electrodes, with openings near the bottom of one and the top of the other, to provide for the circulation of the electrolyte and the passage of the electric current through a long tortuous path from one electrode to the other. To reduce the collection of oxides and precipitates in the

cell, and to lower the freezing point of the electrolyte, glycerin is added to the electrolyte solution, preferably in an amount equal to the water, but the proportions may be varied. This does not seem to me to warrant the contention that it teaches that any consistency of electrolyte mixture could thus be produced, varying all the way from a completely mobile liquid to a solid; as it appears to me that to follow the Hickley disclosure, you would make the electrolyte fluid enough to circulate. That patent deals exclusively with a rectifier, and not only would it not make a usable or worth-while wet condenser, but it in no way resembles a dry electrolytic condenser.

The Hickley patent was cited by the Patent Office in the prosecution of both of the patents in suit.

Neither the patents in suit nor Delco use the construction or electrolyte disclosed in the Hickley patent.

Patent No. 1,008,860, to Frank W. Peek, Jr., assignor to General Electric Company, for electrolyte for aluminum cells, granted November 14, 1911, on an application filed February 5, 1909.

That patent relates to an ordinary jar or cell type of structure having rigid electrodes mounted in it, widely separated. The electrolyte solution contains a borate and a tartrate. In particular, Peek is seeking the prevention of harmful deposits on the anode plate, which may occur in ordinary use or be caused by freezing, and the patentee says that the addition of tartrates to the borates minimizes this difficulty. In some instances a small amount of glycerin, up to about 10 per cent., may be added, causing the electrolyte solution to react acid, helping to overcome the formation of these harmful deposits, but such addition of 10 per cent. of glycerin to the Peek borate-tartrate electrolyte does not materially affect its fluidity. There is no suggestion of the use of anything other than a mobile liquid electrolyte. A dry electrolytic condenser electrolyte would not be useful in the Peek structure, because of the high specific resistance of the electrolyte and the long path between the electrodes.

That patent was cited by the Patent Office in the prosecution of the patent No. 1,714,191 in suit, and was also mentioned by the Examiner in his first action on the patent No. 1,710,073.

The Peek patent was held not to be a pertinent reference against the Georgiev patent on a viscous electrolyte of glycerin, ammonium borate and boric acid, by the Circuit Court of Appeals of this Circuit, Aerovox Corporation v. Concourse Electric Co., supra.

Neither the patents in suit nor Delco use any of the features of the Peek patent, and I fail to find therein any disclosure of the structure or electrolytes of the patents in suit or Delco.

Patent No. 1,074,231, to Clarence I. Zimmerman, James G. Zimmerman, administrator of said Clarence I. Zimmerman, deceased, assignor to General Electric Company, for electrolytic condenser, granted September 30, 1913, on an application filed March 31, 1906.

The structure shown in this patent is almost identical with the Peek patent.

According to the specification, the electrolytes comprise as essentials the aqueous solutions of certain boric acids and their alkali and ammonium salts, and the implication of the whole specification is that the patentee is talking about mobile aqueous solutions, and nothing else would be usable in that structure. According to the specification, the presence of glycerin has been found advantageous in reducing corrosion of the electrodes, and glycerin in quantities up to 30 per cent. or 40 per cent. makes orthoboric acid more active. This is not a direction to add up to that percentage, but an injunction not to add more.

It does not seem to me that Exhibit O, which was practically solid, was prepared in accordance with the directions found in that patent.

The teaching of that patent, as I read it, requires an aqueous solution. In the light of present knowledge, the teaching of the Zimmerman patent, that the concentration of the electrolyte solution should preferably be as great as possible, because the conductivity of the electrolytes is thereby increased, is disadvantageous in wet electrolytic condensers.

The failure of the Zimmerman electrolyte when glycerin is used, both in wet and dry electrolytic condensers, was shown by the witness Booe.

The Zimmerman patent was cited by the Patent Office in the prosecution of patent No. 1,710,073 in suit.

It was found by the Circuit Court of Appeals of this Circuit, in Aerovox Corporation v. Concourse Electric Co., supra, that the Zimmerman patent was in-

sufficient, stating that it would be gratuitous to assume that a decrease in the water of Zimmerman's wet electrolyte would result in Georgiev's electrolyte for a dry electrolytic condenser.

Neither the structure nor electrolyte of the patents in suit or Delco are disclosed by Zimmerman.

Patent No. 603,722, to Charles S. Bradley, for electric condenser, granted May 10, 1898, on an application filed July 29, 1897.

Patent No. 503,186, to Alexander Wurts, assignor to the Westinghouse Electric and Manufacturing Company, for electrical condenser, granted August 15, 1893, on an application filed October 5, 1892.

British patent No. 146,925, to Leon Segal, for improvements in electric condensers, accepted May 19, 1921.

Because the Wurts and Segal patents are so closely related to the Bradley patent, they are all considered together.

In the Bradley patent is disclosed a condenser of the nonelectrolyte type, the dielectric between the condenser plates being stearate of lead. There are also interposed between the condenser plates sheets of an openwork fabric, such as mosquito netting, to prevent short-circuiting by accidental contact of opposite plates.

Wurts patent, No. 503,186, is similar in principle except that the dielectric is elaine oil. The electrodes are of tinfoil, separated by strips of cotton or other textile, or absorbent material rolled up, and the whole roll submerged in the insulating oil, the oil so soaked in the textile substance being the dielectric.

A condenser could not be made by simply substituting an electrolyte for the insulating oil of Wurts, but it would also be necessary to discard the tinfoil electrodes and substitute aluminum electrodes, provided with dielectric films and the gauze spacers, and discard the oil and substitute an electrolyte composition that is compatible with close spacing of the electrodes and with the dielectric films and the gauze spacers.

Segal British patent, No. 146,925, is another instance of the same idea and relates to polyphase electric condensers, made by rolling up sheets of metal foil with sheets of paper, textile fabric, or other suitable material, and impregnating the assembly with an insulating substance which constitutes the dielectric and is normally solid, pasty, or viscous, but is rendered temporarily liquid by heating or by a solvent. It is not an electrolyte. There is no statement of what constitutes the insulating material, but the description applies to the ordinary paraffin paper condensers. In none of these three patents is there any reference to electrolytic condensers, either wet or dry.

The three last discussed patents are generally similar to the Pruessman patent, No. 923,889, which was cited in the prosecution of the patent No. 1,710,073 in suit, which patent shows a condenser made by rolling up interleaved strips of tinfoil and paper, moulding the roll to a rectangular form, and boiling it with melted paraffin wax or other insulating substance. That patent is for all the purposes of this case the same as the Segal patent and in principle similar to the Bradley and Wurts patents.

Nodon French article, May 25, 1926. In a number of places it refers to the device as a condenser, but in the second paragraph of the translation it states, "this device fulfils the same functions as an electrostatic condenser of very great capacity." This is consistent with the device being a polarization cell, as storage batteries, which are polarization cells, were used to fulfil the same functions in an A-eliminator as a condenser of large capacity.

The article states in the last sentence of the second paragraph, "By arranging a milliammeter in the charging circuit, one does not discover the passage of any leakage current across the condenser."

The charging circuit is an alternating current.

Leakage as distinguished from a flow of current cannot be measured on an alternating current circuit with a milliammeter. If a milliammeter placed in series with the device, when connected to the terminals of an alternating current circuit, shows no deflection and no current, then the device has none of the storage properties of a condenser. An ideal condenser would show current on a meter connected with the condenser across the A-C current.

The article in the third paragraph says: "By connecting the foils of aluminum to the two poles of a direct current, we discover, on the contrary, the passage of an appreciable leakage current."

Variation of frequency, in a true condenser, causes a variation of current which

is proportionate to the frequency; and by decrease of frequency to zero, the current becomes direct current, and no current passes at all, except the charging current at the instant of closing the switch which is momentary, and a true leakage current which in commercial condensers is a negligibly small amount. If the Nodon device, when connected to a source of direct current, shows the passage of appreciable leakage current and continues to show it, that shows that the device is not a condenser but merely a high resistance.

The effect described on page 2, paragraph second, of the translation does not differ from the effect produced by any device capable of producing gas. It is no proof that both are condensers, that a polarization cell will produce deflection of the ballistic galvanometer in the same way as a condenser.

The statement is made on page 3, paragraph first, of the translation, that for very small surfaces one obtains capacities of the order of 500,000 mfds. per square decimeter, but the capacity decreases rapidly when the surface increases. This is not the characteristic of true electrolytic condensers including aluminum electrolytic condensers; on the contrary, in them the capacity is proportional, other things being equal, to the area of the dielectric material.

Sesquioxide of iron referred to in that article is not an electrolyte. It is highly insoluble in water ($\frac{1}{10}$ of a part in a million parts of water) and in glycerin (less than one part in a million).

Glycerin has a very high resistance and on Dr. Barsky's test showed no current flowing, although for some purposes commercial glycerin may be suitable; the same test on the mixture of sesquioxide of iron and glycerin indicated a very slight deflection, but on applying that test to a mixture of glycerin sodium bicarbonate and boric acid indicated that mixture to be a tremendously better conductor of electricity than the iron oxide and glycerin mixture.

Sodium bicarbonate, sodium borate, and boric acid are electrolytes.

When they are mixed with glycerin a reaction takes place with the formation of compounds; but when colloidal sesquioxide of iron is mixed with glycerin no reaction takes place.

Mr. Waterman, plaintiffs' expert, said he had never encountered any device resembling the Nodon article, and Mr. Edelman said he did not hear of such a device until recently.

There is a sharp conflict between the experts called by plaintiffs and defendant, both eminent in their professions, Dr. Grosvernor, as a consulting chemist, and Mr. Waterman, as an electrical engineer, but most of the questions for consideration are with reference to electrolytic condensers, as to which Mr. Waterman has had considerable experience.

Neither the patents in suit nor Delco follow the Nodon article. Neither use sesquioxide of iron, and without it the result is no longer Nodon, and when a film-forming electrolyte material is put in the glycerin to make a viscous paste-like consistency, and a practical dry electrolytic condenser, the result is that of the patents in suit, and that is what Delco does.

French patent, No. 401,355, to Jean Hans Russenberger, for improvements in the construction of storage batteries and electrolytic devices. Published August 27, 1909. This patent is for improvements in the construction of storage batteries and electrolytic devices, and has to do primarily with separators that are used for such devices.

The problems which confronted the patentee were to get a separator in a storage battery which would stand attack of the acid and be strong enough to preserve the spacing of the plates, and at the same time be porous enough to permit passage of current without prohibitive resistance. Russenberger mentions as separators, "collodion membranes, paper impregnated with collodion, or paper which has been sulfurized, parchment, etc."

There is nothing in that patent to indicate the use of anything other than a mobile liquid, the patent throughout referring to "liquid" contained in the device.

I do not find that the patentee had in mind any modification of the liquid contained in the device, but, on the contrary, the modification referred to has reference to the production of the membranes.

While in the prosecution of the patent No. 1,710,073 the Examiner did not cite the Russenberger patent, the Examiner did cite a number of patents on separators for storage batteries and electrolytic devices, copies of which are attached at the back of the file wrapper Exhibit 3. These were for prior art analogous to the Rus-

senberger French patent, and patent No. 1,710,073 in suit issued over them.

To modify the Russenberger devices into the Delco condenser, one would have to discard everything of importance to the disclosure of the patent and substitute what is disclosed in the patents in suit.

■ Application which eventuated into patent No. 1,744,014, issued to Joseph Slepian, assignor to Westinghouse Electric & Manufacturing Company, for Polarization-Cell Condenser. Patent granted January 14, 1930, application filed September 12, 1925.

The patent was not issued until January 14, 1930, which was subsequent to Ruben's dates, but the application was filed earlier than any date claimed by Ruben, and for that reason is available as evidence.

For convenience the patent is here used as it corresponds with application as filed.

Slepian, after pointing out what he considers the defects of the electrolytic condensers of the film-forming type, distinguishes therefrom his device, which he calls a polarization cell. This cell operates by virtue of the generation of gas which accumulates at the electrodes and operates as a gas battery momentarily. In the preferred form the Slepian device is comprised of iron sheets interleaved with filter paper impregnated with a saturated aqueous solution of sodium hydroxide to which 30 per cent. of glycerin by volume is added. In an alternative form, that device consists of carbon plates separated by blotting paper saturated with a calcium chloride solution. Carbon is not a film-forming material. The formation of a dielectric film on carbon or iron does not form part of any proper explanation of the Slepian device.

The polarization cell must be operated at very low voltage. If higher voltage is applied, the material of the electrolyte is decomposed and the cell is quickly destroyed.

The polarization cell will produce a condenser effect, but due to an excess of energy consumption the phase displacement is around 45°, whereas the true condenser supplies a current which is 90° out of phase.

In view of the statement in the Slepian application differentiating between the film-forming aluminum condensers and the polarization cell, to which that patent application was directed, which represented his understanding at that time, I can find no warrant in law for holding that Slepian had an opinion that a film was formed on the iron plates, nor can any such finding be based on Hedges' book, Protective Films on Metals, published in 1932 or 1933, some seven or eight years after the Slepian application was filed.

The electrical properties of that device are the important things in this case, and not whether from a chemical standpoint a film forms on the iron or not.

The Slepian device does not act as a condenser with any degree of satisfaction on an alternating current circuit of commercial frequency, because of the time element involved in its process, and would not act as a motor starter condenser. There is a real difference between electrolytic condensers of the film-formed type and the iron-alkali polarization cell device.

To modify the Slepian device to cover the devices of the patent in suit, or Delco, would require the discarding of all that is disclosed as important, with the possible exception of filter paper separators, but both the patents in suit and Delco prefer gauze separators.

Application filed in United States Patent Office by Vannevar Bush, October 1, 1926, Serial No. 138,900. This application has not matured into a patent, and the public has had no opportunity to avail itself of the information given in such application, except with consent of the patentee or his assignor.

The structure described in that application consists of two sheets of metal separated by a sheet of asbestos, blotting paper or the like, to space the metallic plate and absorb the electrolyte or film-forming liquid. Bush preferred nickel-silicon for the metal electrodes, but also suggested aluminum and nickel.

For the electrolyte liquid he proposed a solution of potassium acetate because of its hygroscopic property, and said that the plates and spacer may be rolled up in spiral form and enclosed in a paper carton soaked in paraffin.

That device would not prove commercially practical as the electrolyte has the essential properties of an aqueous solution in a dry condenser structure, and would result in the rapid destruction of the plates.

To modify the device of the Bush application to the condenser of the patents

in suit or Delco, one would have to discard the nickel electrodes, the nickel silicon plates, and the liquid electrolyte solution of potassium acetate and the asbestos, blotting paper, and substitute the aluminum plates, the glycerin ammonium borate electrolyte of viscous paste-like consistency, and a gauze spacer as taught in the patents in suit.

Application filed in United States Patent Office by Philip E. Edelman, January 26, 1927, Serial No. 163,734, for radio power supply device, which eventuated into patent No. 1,753,920, issued to Philip E. Edelman, assignor to Ephraim Banning, on April 8, 1930. This application is too late in date to be effective in and of itself against the patents in suit, but will be discussed later in connection with the alleged prior invention by Edelman.

British patent, No. 17,480, A.D.1901, to Siemens' Brothers, for an improvement in electrolytic polarization cells having an aluminum electrode, accepted November 30, 1901. That patent refers to a cell of the general type referred to in the British patent to Pollak, No. 1,069 A.D.1896, who preferred an alkaline electrolyte, but Siemens prefers an acid solution for the electrolyte. While reference is made in the Siemens' patent to the use of a condenser for starting alternating current motors, no electrolytic cell, such as referred to in that patent, has been produced to serve that purpose satisfactorily. The Siemens patent differs entirely from the patents in suit.

Paper by Albert Nodon, May 25, 1904. This paper seems to me to be much less pertinent than the Zimmerman patent, No. 1,074,231, and whether Nodon was or was not something of an authority in this field, the paper deals primarily with electrolytic rectifiers, although occasional reference is found to electrolytic condensers, but always of the wet type.

The Telegraphic Journal, of July 15, 1873, p. 207. An article which refers to a long obsolete system of automatic telegraphy employing a chemical recorder, and the use in that telegraph, in order to avoid or lessen the disturbing influence of extra currents from the electromagnets, of a modification of M. Plante's liquid condenser, consisting of two leaden plates between which is a thick piece of flannel, saturated with glycerin, so adjusted as to offer about seven times more resistance than that represented by the helices of each electromagnet. There is no indication even of the circuit, but mention is made of adjusting the resistance which is ordinarily inapplicable to a condenser.

Patent No. 1,173,651, to Walter A. Crowdus, for storage battery, granted February 29, 1916, on an application filed April 22, 1915.

That patent shows a storage battery of lead sheets and active material rolled up with a porous absorbent separator made of chemically treated and cooked wood fibres and placed in a jar, which is then filled with the necessary liquid electrolyte. While as a storage battery it might if desired be used to fulfill the functions of a condenser under certain circumstances, it does not have the characteristics of a true condenser. The use of aluminum for the negative element of the storage battery, to reduce its weight, is suggested. The pertinence of this is not apparent to me, as in an electrolytic condenser of the filmed aluminum type, the positive element or anode must be of aluminum for service on direct current and both electrodes must be of aluminum for service on an alternating current.

Crowdus does not disclose the dry electrolytic condensers of the patents in suit, nor have the Delco condensers anything in common with the device of the Crowdus patent.

Edelman's Alleged Prior Invention.

Application for Edelman United States patent, No. 1,753,920, hereinbefore referred to, filed January 26, 1927. That patent did not issue until April 8, 1930, but the patent is used for convenience since the language of the specification is the same as the language of the original specification.

The application which resulted in Ruben patent, No. 1,714,191, was filed December 22, 1926, and the Edelman application was filed more than one month later.

Plaintiffs' Exhibit 44, dated January 3, 1927, of which Mr. Kranz received a copy within a day or two, sets out quite fully the information upon which the application for the Ruben patent, No. 1,710,073, is based, and is thus about three weeks earlier than the Edelman application.

In an effort to carry the Edelman date of invention back and thus render the application effective against either of the patents in suit, considerable testimony was offered on behalf of the defendant.

The device described in the Edelman application in question is of "dry, solid construction," and differentiated from "a dielectric condenser" and a cell. It is further described as comprising electrodes preferably of aluminum, separated by a thin sheet of a chemical medium, sodium phosphate, crystallized in solid form and held in a thin layer of cellucotton or other suitable fabric material." The molten chemical in which the absorbent holder is immersed is allowed to cool and crystallize.

An alternative mode of construction for the condenser element 16 is to impregnate the carrier-sheet with the chemical, assemble it with the electrodes, and apply heat briefly to insure intimate contact of the carrier sheet, active material, and the electrodes. The natural property of the sodium phosphate used is to adhere to the surfaces of the electrodes when application is made in the molten state.

Sodium phosphate melts at 35° C., a comparatively low temperature, and thus molten is accurately used to describe the chemical which, when it cools down, solidifies to a hard, solid mass, which is what Edelman specified throughout his application, and was all that he desired.

This is confirmed by his later work at the Stewart Battery Company, and the condensers made by that concern, in evidence as Exhibits DD, EE, and FF.

While that device enjoyed some measure of commercial production, and Edelman received from it some financial benefit, it is now obsolescent if not practically obsolete.

The testimony offered in the effort to carry back the Edelman date of invention in brief is as follows:

Exhibit V sketch, Exhibit W sheet of rough notes dated 2/6/26, Exhibit X sheet of rough notes, dated 8/21/26, Exhibit Y condensers said to have been made in August 1926, Exhibit Y–1 illustrative drawing, Exhibit Z remains of an A-eliminator, Exhibit Z–1 sketch, Exhibit AA receipt, dated September 1, 1926, Exhibit BB–3 receipt dated November 3, 1926, Exhibit BB–2 receipt dated November 30, 1926, Exhibit U sketch, dated December 8, 1926, Exhibit BB–1 receipt dated December 20, 1926, and Exhibit PP, advertisement from January, 1927, issue of Radio Retailing.

Not one of those exhibits which is dated shows or describes the rock-hard condenser of the Edelman application, nor does any of those exhibits which purports to be a condenser bear a date or signature of any kind. In view of the detailed advice to inventors given by Edelman in his book, and his ability to prepare his own patent applications, it is strange to find that in no instance did he follow his own advice.

I see no reason to doubt that Edelman showed to the witness Eddy something in the way of an A-eliminator which Eddy thought was important and for which he gave the receipt Exhibit BB–1.

None of the people purported to have signed the receipts Exhibits AA, BB–2, and BB–3 were called as witnesses.

There is no indication in any of the receipts in evidence as to the nature of the device receipted for except that it was for an A-unit or Poweradio A-unit. All A-units made by Edelman since 1925, without distinction as to type, had been called by him Poweradio. In 1925 they contained a small storage battery jelly cell, used as a condenser.

Accepting as true Mrs. Edelman's testimony, it does not seem to me to be sufficient to carry back Edelman's date of invention, especially in view of the fact that there is not in evidence a note book entry or paper with or without signature, or witnessed or unwitnessed, which describes his A-condenser, prior to his application sworn to on January 24, 1927, and filed on January 26, 1927.

The date when the witness Hauser met Edelman is indefinitely fixed, there is not produced any receipt signed by Hauser or Brown and Caine, the concern with which he was connected, and he learned nothing about the character of the electrolyte material in the device shown him by Edelman, but testified that it was very sticky.

I cannot harmonize that statement with Edelman's testimony.

The witness Eddy learned that electrolyte was an ammonium chloride. Edelman's application and testimony was that his A-condenser contained sodium phosphate.

The testimony of the witness Dillon did not relate to Edelman's work prior to the filing of his patent application.

The testimony of the witness Potter, who first met Edelman in October, 1928, did not relate to Edelman's work prior to the filing of his application.

The testimony and exhibits with reference to Edelman's rock-hard A-condenser does not present to me convincing proof, of the quality required, of a definite device, at a definite date prior to January 26, 1927, his filing date.

This brings us to the testimony and exhibits offered with reference to Edelman's B-condenser with a gauze spacer and an electrolyte containing gum arabic and glycerin, which the Potter Company is now making.

Edelman's application for his patent No. 1,974,179, filed April 18, 1928, contains the first description of his B-condenser contained in any of his patents or applications, and that is for a condenser consisting of aluminum plates and gauze spacers with a viscous electrolyte of gum arabic dissolved in hot glycerin.

That patent contains a cross-reference to patent No. 1,773,665, on application filed April 12, 1928, for a suitable method of preparing the electrode plates, by using ammonium molybdate in dilute solution; but there is no reference to the use of ammonium molybdate and glycerin in an electrolyte for the finished condenser.

In patent No. 1,961,746, on application filed April 19, 1928, there is described a voltage regulating device consisting of a jar in which aluminum electrodes are suspended in an electrolyte of hepta ammonium molybdate crystals dissolved in pure hot glycerin; there is no interposition of any gauze spacer, and the combination is not suggested as a condenser electrolyte.

In the three last above recited patents there is no suggestion of the condenser claimed to have been made in 1926.

Dillon, whose connection with the Stewart Battery Company commenced in the middle of April, 1927 and ended in the early part of 1928, testified to Edelman's work on B-condensers, and fixed the approximate date for the experimental work as the fall of 1927, and also testified to purchases of some glycerin, gauze, and special aluminum which went into experimental B-condensers, but not to the purchase of ammonium molybdate.

There is in evidence no writing of any character relating to the B-condensers prior to the filing date of April, 1928.

Edelman testified that there was only one B-condenser made at the time he showed it to Eddy. Mrs. Edelman testified that one was on their radio indefinitely.

Eddy was not asked to identify Exhibit GG as anything he had ever seen before, but he testified that Edelman had showed him what he said was a B-condenser, and indicated that the little black device which he examined was lying loose in the laboratory.

Though Eddy was manufacturing B-eliminators at that time, and was particularly interested in a B-condenser, his receipt dated December 20, 1926 relates only to an A-unit.

He did nothing further in connection with any B-condenser.

In Edelman's application, filed January 26, 1927, he stated that both A and B supply units could be constructed as therein set forth, but he did not, however, mention any other than the rock-hard condenser.

While I believe that both Edelman and Mrs. Edelman testified to what they believed to be true, it seems to me that a detailed description such as they gave of the parts that went into the B-condenser, the ammonium molybdate and glycerin electrolyte, and the manner in which they were put together, based entirely on recollection, after a lapse of 8½ years, is not sufficient to show anticipation by prior invention, and yet this is the only testimony which is at all definite as to the B-condenser at any date prior to Ruben's dates.

And in passing, we must not overlook the fact that Mrs. Edelman testified that Edelman was always experimenting since she first knew him in 1925, and yet she is able to pick out the condenser, out of all these experiments, and recall that it was made a short time before Thanksgiving of 1926.

Edelman first learned of the Ruben patents in September, 1929, according to his admission, but according to the file wrapper (Exhibit 31) of an interference between Edelman and Ruben, it is indicated that the two Ruben patents in suit were specifically called to Edelman's attention in July, 1929, and his course of action since that time is inconsistent with the detailed recollection of Edelman and his wife.

From the time he first had personal knowledge of the Ruben patents in suit, in 1929, Edelman not only failed to make any claim in the Patent Office to a date earlier than Ruben, notwithstanding the

fact that at all times he had pending in the Patent Office one or more applications disclosing a condenser comprising filmed aluminum plates, gauze spacers, and an electrolyte of gum arabic dissolved in glycerin, and the Ruben patents were cited against him in 1930, but he made the positive assertion under oath, on March 14, 1934, that he first conceived certain subject matter which is embodied in Exhibit GG, on October 1, 1927, and first reduced it to practice on October 5, 1927.

Edelman's explanation as to the affidavit of March 14, 1934, that his memory is better now than then, is not convincing.

Edelman failed to produce any note book entries, and the date scratched on the outside of Exhibit GG is not convincing.

On all the testimony as to the B-condenser the defense of prior invention is not established. Barbed Wire Patent, 143 U.S. 275, 284, 285, 12 S.Ct. 443, 450, 36 L. Ed. 154; Deering v. Winona Harvester Works, 155 U.S. 286, 300, 301, 15 S.Ct. 118, 39 L.Ed. 153; A. B. Dick Co. v. Simplicator Corporation (C.C.A.) 34 F.(2d) 935, 940; Young v. Wolfe (C.C.) 120 F. 956, 959, affirmed (C.C.A.) 130 F. 891.

Edelman never filed an application for patent on a condenser comprising filmed aluminum plates, gauze spacers, and an electrolyte of ammonium molybdate and glycerin. In his applications for patents filed in April, 1928, and August, 1929, he disclosed condensers comprising filmed aluminum electrodes, gauze spacers, and an electrolyte of gum arabic dissolved in glycerin.

Notwithstanding Eddy's interest in B-condensers, Edelman's dealings with Eddy were confined to a rock-hard A-condenser.

Hauser knew nothing about the B-condenser, although his company manufactured B-condensers for the Stewart Battery Company, of the tinfoil and paper variety, and learned of the construction of the rock-hard A-condensers.

Dillon testified that all the Stewart Battery Company did as to Edelman's B-condenser was to experiment with it in the fall of 1927, and that it never went into production. That he remembered buying some materials for another condenser that Edelman was experimenting with, which he enumerated but did not mention ammonium molybdate.

The Edelman affidavit of March 17, 1934, made while Exhibit GG was in his possession, fixes October 1 and 5, 1927 as his best dates, notwithstanding the fact that it was clearly to his interest at that time to claim the earliest date he could establish.

Edelman's testimony, that until Mr. Fidler prodded him, he never thought of the condenser Exhibit GG as having any bearing on the date he swore to in March, 1934.

The B-condensers which have been sold commercially under Edelman embodied an electrolyte of gum arabic and glycerin, with no ammonium molybdate.

■ On all the evidence it is clearly established that even if Edelman made Exhibit GG on November 15, 1926, it was an abandoned experiment and cannot anticipate the patents in suit. Coffin v. Ogden, 18 Wall. 120, 21 L.Ed. 821; Wayne v. Holmes, Fed.Cas.No.17,303, 2 Fish.Pat. Cases 20; Jones v. Pearce, 1 Webster's Pat. Cases, 122; Permutit Co. v. Harvey Laundry Co. (D.C.) 274 F. 937, affirmed (C.C.A.) 279 F. 713; Corn-Planter Patent, 23 Wall. 181, 211, 23 L.Ed. 161; Deering v. Winona Harvesting Works, supra; Frank F. Smith Metal Window Hardware Co. v. Yates (D. C.) 216 F. 361, 363, affirmed (C.C.A.) 216 F. 359; American Metal Cap Co. v. Anchor Cap & Closure Corporation (D.C.) 278 F. 670.

I cannot find proper ground for defendant's division of the electrolytic condenser with spacers into two classes, "wire lath and plaster" class of construction, and "absorbent spacer" class, nor can I harmonize its contentions as to the classes to which it assigns the prior art patents, respectively.

■ An examination of the prior art offered in evidence leads me to the conclusion that it fails to disclose any single patent or publication or instance of alleged prior knowledge and invention which taught the art how to make a satisfactory dry electrolytic condenser.

While it is possible to pick out one element from one patent and other elements from other patents, divorcing each from its own context, there was not pointed out, nor do I find any instance of the prior art, which described the combination of structure and electrolyte invented by Ruben, the combination of structure and electrolyte used by Delco.

The evidence is insufficient to establish anticipation. Eames v. Andrews, 122 U.

S. 40, 66, 7 S.Ct. 1073, 30 L.Ed. 1064; Cohn v. United States Corset Co., 93 U.S. 366, 370, 23 L.Ed. 907; Downton v. Yeager Milling Co., 108 U.S. 466, 471, 3 S.Ct. 10, 27 L.Ed. 789; Diamond Power Specialty Corporation v. Bayer Co. (C.C.A.) 13 F.(2d) 337, 341; Topliff v. Topliff, 145 U.S. 156, 161, 12 S.Ct. 825, 36 L.Ed. 658; Kryptok Co. v. Stead Lens Co. (D.C.) 207 F. 85, 95, affirmed (C.C.A.) 214 F. 368; McMichael & Wildman Mfg. Co. v. Ruth (C.C.A.) 128 F. 706, 708; Naylor et al. v. Alsop Process Co. (C.C.A.) 168 F. 911, 920; Hillard v. Fisher Book Typewriter Co., 159 F. 439, 441, 86 C.C.A. 469; Atlantic, Gulf & Pacific Co. v. Wood (C.C.A.) 288 F. 148, 155.

We will now consider the defense of noninvention.

■ Of course to be valid, the patents in issue must be the result of invention and not merely the exercise of the skill of the calling, or an advance plainly indicated by the prior art. Electric Cable Joint Co. v. Edison Co., 292 U.S. 69, 79, 80, 54 S.Ct. 586, 78 L.Ed. 1131.

■ The test is whether the selection of the elements, and the making of the particular combination, was obvious to those skilled in the art at the time of the making of the invention of the patent in suit.

■ That Ruben made an advance in the art is shown by the fact that Col. Mershon, concededly a man of great skill in the wet electrolytic condenser field, witnessed the drawing of the Wurts patent, No. 503,186, which was one of the prior art patents offered in evidence by defendant, which showed rolled sheets of metal foil interleaved with gauze spacers and impregnated with oil which served as a dielectric condenser but never produced a dry electrolytic condenser.

Ruben combined the gauze spacers, the film-forming aluminum foils, and the glycerin film-maintaining electrolyte of viscous paste-like consistency to produce a workable dry electrolytic condenser.

The prior art in evidence shows that workers before Ruben had sought to overcome the disadvantages inherent to wet electrolytic condensers, and thought the result could be accomplished in a simple way by causing the well-known electrolytes of wet condensers to be absorbed in porous material between the electrodes.

The result desired was not accomplished in that way, as wet electrolytic condensers are extremely susceptible to the ruinous effects of minute amounts of certain common impurities, and the absorption of the wet condenser electrolytes in the porous material results in sparking which carbonizes the porous material and permanently ruins the condenser.

The electrolyte of the Ruben dry electrolytic condensers, on the contrary, decreases the rate at which the impurities attack the electrodes, to such an extent that the harmful effect becomes negligible and the presence of a much larger amount of impurities is tolerable. The range between operating voltage and sparking voltage is greater in the Ruben dry electrolytic condenser than in wet condensers, and therefore the sparking that occurs in normal operation of wet condensers does not occur in the normal operation of dry condensers, obviating carbonization of the spacer material.

Edelman, who was experienced in the use of wet electrolytic condensers and jelly batteries, and knew their drawbacks, attempted to solve the problem in a different way, by rolling up aluminum foils, without any dielectric film on them, with blotting paper spacers, and poured the assembly full of a molten chemical mixture, sodium phosphate and ammonium phosphate, which solidified on cooling to rock-like hardness, being advertised as "Flintox —hard as flint, strong as an ox." During the cooling he supplied electric current to the aluminum sheets so as to form a dielectric film on one of them. The chemical mixture used was in no sense paste-like. These devices worked for a time, but lost capacity quite rapidly and were not a factor in the competitive field.

Other prior art patents suggested the thickening of a wet condenser electrolyte by means of gelatin, water-glass, etc., but they also resulted in failure.

Ruben produced for the first time, hitherto unknown, electrolyte compositions compatible with dielectric films, compatible with close spacing of aluminum plates separated by gauze spacers, and more tolerant of impurities.

The dry electrolytic condenser is a combination of two or more plates, at least one of which is of filmed aluminum and a film-forming electrolyte, held by a suitable spacer between and in close contact with the plates. The electrolyte composition must be such as to promote the con-

tinued operation of the device as a condenser.

Glycerin possesses the following highly important characteristics as one of the materials of a dry condenser electrolyte; it has high viscosity that provides a low diffusion rate and a low ionic mobility and a high stickiness that causes it to adhere to the foil and keep it always wet; it is of a dielectric rather than of a conductive nature, which permits of a high resistance in the electrolyte composition to give dispersion of the conducting elements over the whole surface and prevent localization; its hygroscopic properties are also important, particularly in maintaining the equalization of moisture content and the equalization of current, and it has a low vapor tension which minimizes evaporation, and a high surface tension which aids in preventing the escape of the electrolyte from between the plates.

When, as is the case in wet electrolytic condensers, electrolyte materials such as sodium or ammonium borate and boric acid are dissolved in water, the resulting solution has high electrical conductivity and the ions into which the electrolyte materials are dissociated can acquire very high speed.

The mobility of the ions in a viscous glycerin electrolyte composition is held down and the electrical conductivity of the composition is highly restricted; the conducting ions, however, are dispersed throughout the composition and cannot readily concentrate at one point.

In wet condensers, there must be wide spacing between the plates, or the current will tend to localize at a few points and attack the films and plates beyond their ability to protect or repair themselves; also because of high dissociation and high mobility, they are quickly ruined by minute amounts of impurities.

In dry condensers much larger amounts of impurities are tolerated, due to the viscous nature of the electrolyte composition, the low dissociation, the low mobility of the ions, and the obstacles which these things present to localization of the current.

An electrolyte suitable for dry condensers is not made by thickening of an aqueous electrolyte by putting pumice, kieselguhr, filter paper, etc., in it, or by putting gelatin or starch or water-glass in it.

The viscous paste-like electrolyte composition produced with glycerin and sodium or ammonium borate and boric acid makes the dry electrolyte condenser a practical and successful device, having a temperature range much wider than wet condensers, greater freedom from chemical corrosion and resultant deforming, much less sensitiveness to impurities, and toleration of higher voltages with less gassing.

The Ruben patents taught the art, that for which it had long been seeking, the way to make practical commercial dry electrolytic condensers.

This was a distinct advance in the art and constituted invention. Imhaeuser v. Buerk, 101 U.S. 647, 660, 25 L.Ed. 945; Parks v. Booth, 102 U.S. 96, 104, 26 L. Ed. 54; Bragg-Kliesrath Corporation v. Farrell (C.C.A.) 36 F.(2d) 845, 850; Independent Coal Tar Co. v. Cressy Contracting Co. (C.C.A.) 260 F. 463, 469; J. L. Owens Co. v. Twin City Separator Co. (C.C.A.) 168 F. 259, 265; Kryptok Co. v. Stead Lens Co., supra; Naylor et al. v. Alsop Process Co. (C.C.A.) 168 F. 911, 917; Webster Loom Co. v. Higgins, 105 U.S. 580, 591, 26 L.Ed. 1177; Krementz v. S. Cottle Co., 148 U.S. 556, 560, 13 S. Ct. 719, 37 L.Ed. 558.

█ The defense of double patenting depends upon the particular circumstances of each case.

█ The burden of proof is on the defendant to overcome the presumption of validity. Cantrell v. Wallick, 117 U.S. 689, 695, 6 S.Ct. 970, 29 L.Ed. 1017.

█ The applications for the two patents in suit were copending. The first patent in suit is not prior art to the second. To obviate double patenting, it is only necessary that the claims be not the same, and it is not even necessary that the claims of the second patent embody a patentable advance over the first patent. Traitel Marble Co. v. U. T. Hungerford Brass & Copper Co. (C.C.A.) 22 F.(2d) 259.

█ The defenses of invalidity of the first patent in suit and double patenting are inconsistent defenses. H. C. White Co. v. Morton E. Converse & Son Co. (C.C.A.) 20 F.(2d) 311.

Unless claims 2 and 5 of patent No. 1,710,073 in suit are valid, the defense of double patenting of claim 4 of patent No. 1,714,191 in suit is not available. Ameri-

276

can Hatters & Furriers Co. **v.** Danbury & Bethel Fur Co. (D.C.) 47 F.(2d) 268, 269.

■ The defendant in its brief selects for comparison claims 2 and 5 of patent No. 1,710,073, and claim 4 of patent No. 1,714,191.

Patent No. 1,710,073 in suit specifically states that it is a continuation in part of Ruben's copending application, Serial No. 156,308, filed December 22, 1926, which resulted in patent No. 1,714,191.

The claims of the two patents in suit selected by the defendant are not identical.

Claim 2 of patent No. 1,710,073 calls for glycerin and a film-forming electrolyte.

Claim 5 of patent No. 1,710,073 calls for an electrolyte in supersaturated form suspended in a medium combining viscosity, hygroscopicity, and a relatively high dielectric constant.

Claim 4 of patent No. 1,714,191 calls for "a mixture of a hygroscopic and viscous material and a neutral salt."

The following other differences are to be noted:

Claim 6 of patent No. 1,714,191 specifies a dielectric wide-meshed cloth, and claim 7 a porous spacer to hold the electrolyte composition between the electrodes.

Claims 2, 5, and 6 of patent No. 1,710,073 refer to spaced or separated electrode members, while claim 7 refers to a spacer, and claim 8 is directed to the electrolyte.

The claims of these two patents selected by the defendant, and the claims last hereinbefore referred to, are not coextensive. Hartford-Empire Co. v. Hazel-Atlas Glass Co. (C.C.A.) 59 F.(2d) 399, 411.

The case of Cadwell v. Firestone Tire & Rubber Co. (D.C.) 13 F.(2d) 483, cited by the defendant, is not in point. In that case the first patent was regarded as prior art available against the second patent, while in the instant case neither patent in suit is prior art as against the other.

The patents in suit are valid.

■ We now come to a consideration of the question of infringement.

The claims in suit of the two patents in suit read as follows:

Patent No. 1,710,073.

"2. In an electric condenser, the combination with spaced film forming electrode plates, of a conductive composition there-between containing glycerin suspension medium and a film-forming electrolyte suspended therein, the proportions of suspension medium and electrolyte being such that a mixture of paste consistency is formed."

"5. In an electrolytic cell, the combination with separated electrode members, of a conductive material for disposition between the electrodes comprising an electrolyte in supersaturated form suspended in a medium combining viscosity, to afford a paste like mixture with said electrolyte, hygroscopicity to maintain the water content of the electrolyte substantially at its initial value and a relatively high dielectric constant to afford added electrostatic capacitance to the cell, said material being the sole vehicle for electrical conduction.

"6. In an electric condenser, the combination with spaced film-forming electrode plates, of a conductive composition there-between containing glycerin suspension medium and a film-forming supersaturated electrolyte suspended therein, the proportions of suspension medium and electrolyte being such that a mixture of paste consistency is formed, said glycerin affording hygroscopicity and a greater value of dielectric constant to the composition and said glycerin and said supersaturated electrolyte adding electrostatic capacitance to the condenser over that provided by the films formed on the electrode plates, said composition being the sole vehicle for electrical conduction.

"7. In an electric condenser, the combination, with a pair of film-forming electrodes and a spacer therebetween, of a conductive medium comprising a mixture of glycerin and a film-forming electrolyte composition of a supersaturated solution of boric acid and sodium borate, said glycerin affording hygroscopicity, viscosity and a greater value of dielectric constant to the conductive medium and said glycerin and said supersaturated solution adding electrostatic capacitance to the condenser over that of the films on the electrodes, said medium being the sole vehicle for electrical conduction.

"8. A paste electrolyte for electric condensers comprising as sole vehicle for electrical conduction glycerin and a film-forming composition of boric acid and sodium borate in supersaturated plastic form, the proportions of the ingredients being such that their mixture possesses a comparatively high viscosity at ordinary temperatures,

said glycerin affording hygroscopicity to maintain the water-content of the paste electrolyte substantially at its initial value and a greater value of dielectric constant to said electrolyte and said glycerin and said composition affording added electrostatic capacitance to the condensers."

Patent No. 1,714,191.

"4. An electrical condenser comprising film forming electrodes separated by a paste electrolyte comprising a mixture of a hygroscopic and viscous material and a neutral salt, said material to afford a paste like mixture with said neutral salt and to maintain the water content of the electrolyte substantially at its initial value, said electrolyte being substantially the sole vehicle for electrical conduction.

"5. An electrical condenser comprising film-forming electrodes separated by an electrolyte in paste form comprising as sole vehicle for electrical conduction a mixture of a neutral salt, an acidic stabilizing compound and a material combining hygroscopicity and viscosity to afford a plastic mixture with said neutral salt and compound and to maintain the water content of the electrolyte substantially at its initial value.

"6. An electrolyte condenser having film forming electrodes and an electrolyte mixture in paste form comprising as sole vehicle for electrical conduction a neutral salt, an acidic stabilizing compound and a material combining hygroscopicity and viscosity to afford plasticity with said neutral salt and compound and to maintain the water content of the electrolyte mixture substantially at its initial value, said electrolyte mixture permeating a dielectric wide meshed cloth, interposed between the electrodes and acting as a base to hold said electrolyte in proper form between the electrodes.

"7. An electrolytic condenser, comprising spaced film-forming electrodes, a porous spacer and a viscid electrolyte mixture between the plates, said mixture comprising a viscous material and an electrolyte, said viscous material serving as a carrier medium for said electrolyte and said viscous material and said spacer both serving to keep the mixture between the electrodes."

I find no instance in the prior art where the combination or the electrolyte composition of any of the claims in suit of either or both of the patents in suit are found.

Whenever the Edelman rock-hard A-condensers became an accomplished fact, either before or after the effective date of either or both of the patents in suit, it lacked the viscous and paste-like essential characteristics of the patents in suit.

The Delco condensers of which complaint is made comprise the film-forming aluminum electrode plates with dielectric films formed thereon, the gauze spacers, the conductive composition between the plates containing glycerin suspension medium and a film-forming electrolyte suspended therein, to constitute a viscous mixture of paste-like consistency.

Glycerin is a viscous and hygroscopic material, and the Delco electrolyte will take up the moisture from the air.

The glycerin of the Delco electrolyte is the same glycerin described in the patents in suit and has the same dielectric constant and the same effect upon the capacity of the condensers containing the electrolyte composition.

The fact that the Delco condensers employ an 80x80 mesh gauze, while the patents in suit mention 10-24 meshes to the inch, represents no patentable difference, but is simply a matter of adapting the gauze to the aluminum foil, and the viscosity of the particular electrolyte used.

The contention of the defendant that there is no new thing that is common to the Ruben and Delco condensers is not sustained. No repetition of what has already been said is necessary to show that is a fact.

The terms "paste" and "paste-like consistency" are used in the patents in suit with their ordinary meaning, and not with reference to any strict scientific meaning.

There is no precise scientific definition of the word "paste."

The defendant's expert offered a definition between liquids and plastics which I am convinced did not define the terms "paste" and "paste-like consistency" as used in the patents in suit.

The observations of the defendant's expert were made primarily on what is in the impregnating tank before and after the condenser sections are impregnated.

Cross-examination brought out that when the electrolyte drained from the impregnated condensers on to the inclined

funnel-shaped drainboard, some of it stuck there and was quite thick and self-sustaining.

That is one of the essential things about paste.

He said that at a later time he attempted to extract the electrolyte from some Delco condensers, and that after the extraction by heating and pressing, the material retained the characteristics of a true liquid in the strict scientific sense.

Some of the electrolyte which was scraped from an actual Delco condenser, opened in court, showed pastiness, a viscous material with small particles suspended.

That the clear material with which the condenser is impregnated gradually acquired crystals suspended in it shows the supersaturated condition of the electrolyte.

I cannot follow defendant's expert in his attempt to make a definition of paste which would include the electrolyte of the patents in suit and exclude the Delco electrolyte.

There is no radical difference between the Ruben condensers and the Delco condensers.

Exhibit 53, a condenser containing an electrolyte of the preferred proportions stated in the Ruben patent, No. 1,710,073, has accumulated 20,000 starts of three seconds each at two starts per minute on a 110-volt line.

The Ruben condensers had a capacity of .25 mfd. per square inch, the Delco condensers, .247 mfd. per square inch.

The Delco units had a power factor of from 5 to 8 per cent., the Ruben condenser 3.5 to 4.25 per cent.

Exhibit 54 shows what the consistency of the Delco electrolyte is when prepared in accordance with stipulation by mixing 65 per cent. of glycerin with 35 per cent. of ammonium borate and heating it to a temperature slightly less than 235° F., that is, just long enough to insure complete solution of the ammonium borate, and the viscous material is pasty, and there is a suspension of crystals.

It is true that the specimen has not been subjected to the period of heating (5½ hours or more) while the condenser sections are being impregnated, but there is no suggestion on the part of the defendant that the prolonged heating, while the condenser sections are being impregnated, destroys the essential nature of this material and converts it to something of an entirely different nature from the electrolytes of the Ruben patents.

Defendant's expert indicated that there is no glycerin and no ammonium borate present, as such, in the Delco electrolyte, though the starting materials are glycerin and ammonium borate, but I cannot accept that as a basis for a holding of non-infringement. With the exception of a small amount of water, the materials, glycerin and ammonium borate, originally mixed together, have not been driven off, otherwise there would be no electrolyte left. The change, if any has taken place, is not because different materials were used, but because the materials were cooked for a greater length of time.

Claims 7 and 8 of the patent No. 1,710,073 in suit call for a conductive medium of glycerin, boric acid and sodium borate. There is no sodium borate in the Delco electrolyte, but ammonium borate and sodium borate are regarded as equivalents in dry electrolytic condensers. Aerovox Corporation v. Concourse Electric Co., supra.

The particular commercial variety of ammonium borate used in making the Delco electrolyte contains a small amount (.6 per cent.) of free boric acid over that required for pure ammonium borate, and the Delco electrolyte contains a small amount of excess boric acid.

With reference to the claims of patent No. 1,714,191, which call for a neutral salt and an acidic stabilizing compound, it appears that ammonium borate, in saturated solution, is nearly neutral, very slightly alkaline, and is more nearly neutral than sodium bicarbonate or sodium borate (borax).

The contention of the defendant, that the Delco gauze spacer is not in any sense "dielectric" is not sustained. Insulating and dielectric are synonymous and mean "non-conducting."

Patent No. 1,714,191 in suit describes the spacer as "an insulating gauze-like textile."

There is no distinction between the gauze spaces of Delco and of the patents in suit. Both are equally dielectric and the electrolyte composition which permeates them in the finished condenser is the conductor.

A review of the prior art not only shows that in it there is not found, in any patent, publication, or alleged prior invention or use, a disclosure of a practical dry electrolytic condenser, combining the features which the Ruben and Delco condensers possess in common, nor could any of them be modified to produce the same result in the same way as the patents in suit, without discarding the essential features of such prior art patents, publications, or alleged prior inventions or uses, and substituting the essential features of the patents in suit, and that neither the patents in suit nor the Delco condensers follow the prior art.

No unnecessary limitations should be read into the claims of either of the patents in suit, and no significant departure from the disclosures of the patents in suit has been made by the defendant.

The defendant orally pays its tribute of praise to the prior art, but with all the prior art to choose from, including the electrolytes of the wet condensers with aluminum plates and gauze spacers, the gelatinizing of the aqueous electrolytes of wet electrolytic condensers with gelatin, waterglass and the like, and the rock-hard sodium and ammonium phosphate of Edelman, even if its development should be held to be prior to the invention dates of the patents in suit, it offers to the patents in suit the sincerest form of flattery, imitation, and uses the combination of filmed aluminum electrolytes, gauze spacers, and an ammonium borate glycerin electrolyte of viscous paste-like consistency of the patents in suit.

The Delco condensers of which complaint is made in this suit infringe the claims in suit of each of the patents in suit.

A decree should be entered in favor of the plaintiff against the defendant on the claims in suit of both of the patents in suit, with injunction and costs and the usual order of reference.

Settle decree on notice.

Submit proposed findings of fact and conclusions of law in accordance with this opinion, for the assistance of the court, as provided by Equity Rule 70½, 28 U.S. C.A. following section 723, and rule 11 of the Equity Rules of this court.

Dean, Fairbank, Hirsch & Foster, of New York City (Morris Hirsch, of New York City, of counsel), for plaintiff.